United States v. Thomas Overton. Mr. Morrison. Good morning. Good afternoon. Good afternoon. Thank you, your honor and members of the court. Unless the court steers me in a different direction, I intend to take up the majority of the time talking about the alleged expert testimony of Agent Gierske's. The government's body of evidence in this case can broadly be categorized in three ways. First, Agent Gierske's expert testimony. The defendants, my clients, alleged customers, most of whom were discovered by law enforcement just two or fewer weeks prior to trial. And then my clients alleged co-conspirators who essentially said that he couldn't be trusted and he was a drug user and he had to be given only small amounts of heroin because he would either use it or steal it or something. In the absence of this expert testimony, I submit that there was insufficient evidence to find my client guilty. Now, turning to Agent Gierske's expert testimony, of course, an expert law enforcement agent can testify regarding drug based on his or her expertise. They can't testify as to everyday words. They can't summarize their beliefs about the defendant's conduct. They can't, this comes straight from 8th Circuit case law, they can't food feed the meaning of certain conversations to jurors. They can't interpret plain but vague English language. And Agent Gierske's expert testimony was replete with this type of testimony that is impermissible. I can give some examples and some really troubling implications for other types of criminal cases. Turning to Exhibit 2A, just one example, my client supposedly said, well, he did say, these guys is, boy, they is just going crazy. It's been a lot and a lot going on. Agent Gierske's testified that what he meant was a lot of people are getting the heroin. Thomas was selling this heroin. People are crazy about it and lots going on like he's going to need some more. The implication here, just to give one example, is a stock trader who calls her supervisor and says they're going crazy, and a government law enforcement expert testifies that what she really means is, my clients love these penny stocks I'm fraudulently pushing, I'm going to need some more such stocks. Another example, my client said, it's the first of the month, too, all these people about to get that paper like that. Agent Gierske's testimony said, had him say that my client said or meant, the first of the month is a big day to sell amounts of heroin because a lot of people get a check from the government, whether it is disability, social security, they are going get the most amount of drugs they can with their check. An example of an implication here is, not to cast aspersions on your chosen career, but a judge tells his clerk, it's the first of the month, all these people get that paper like that. Can a government expert testify what the judge really means? The first of the month is a big day to take bribes because throwing cases, for throwing cases because a lot of people get paid, so they are going to offer bribes if they can't. The implications of approving of Agent Gierske's expert testimony are wide ranging and they are troubling. How much of these little summaries would you say were based actually on hearsay versus basically his understanding of the investigation from talking to some of the other co-conspirators versus what's really lingo that needs to be, I guess, explained to a lay jury? There was precious little lingo, if any, in these conversations. So my only conclusion can be either he abused his discretion, the court abused its discretion in approving him as an expert witness or Agent Gierske was indeed testifying based on his knowledge of this investigation, which itself is not necessarily impermissible, but the court has to take steps to separate somebody's expert testimony from their lay testimony. So if he had an understanding from his own observations or surveillance of this particular organization, is that what you mean? He could testify to that? Yes, and I can give you an example. My client said I had to redirect it and I didn't want to do that. Agent Gierske could have testified, well, Mr. Overson said I had to redirect it and I didn't want to do that, and I observed him three hours ago taking money out of one bank and putting it into another or something like that. But there was no such testimony. And furthermore, the court- Go right ahead. I'm sorry. I keep thinking about these examples and they're replete in the transcript, but I keep finding myself in a position where I feel like I can't really analyze what was let in for what purpose, which is always the problem when you have a fact witness who's done the investigation, who's now combined with being an expert witness. And that's why we say it's not a preferred practice. But I get where there might be some basis in experience and training and knowledge that arose outside of the existence of this particular conspiracy that some of these statements are in fact in some code that is used by some group of drug dealers who more broadly exist in this geographic area, right? But ordinarily, you'd have to ask the foundational questions. Do you understand what that means? Yes, I do. How did that come to be? Well, here's this, it's based on my training. And with an expert, we'd at least know where that came from. Whereas we're sitting here in this sort of mixed witness place where I can't tell how much do I know because I'm just an expert in drug lingo because I've been dealing with these people who do drugs for my whole life, and how much of it is, I know what these guys are saying because the four cooperating witnesses explained what they meant and what they understood. And I can't sort it out. And so what am I supposed to do with that? Well, you're absolutely right, Your Honor, that a law enforcement can base his or her expertise on experience. But I would vehemently disagree that there's any drug lingo here. I mean, drug lingo pops out at you. Drug lingo is, hey, what does cheese mean? Well, cheese means money. What does biscuit mean? Well, it could mean a gun, things like that. We're talking about taking Mr. Overton's sentence, this is the number that I am at, this is the phone number that I'm at, converting that into expert testimony to mean this is the number I currently have, I will be calling from this number when I need more heroin. Where in Mr. Overton's statement, this is the number that I'm at, is there a code for heroin? It exists nowhere. And I think you're probably right that Agent Gierske did have knowledge of this investigation that he used to interpret these sentences. But that's an improper basis for expert testimony. And it is impermissible for an expert to testify or to interpret plain but vague English language. It's improper to spoon feed the meaning of conversations. And I think you might be overstating the argument, which is, you know, I've got a little chart here with a lot of these statements. And one of them is, I'm going to leave out some of the expletives. But what I hate is there's others getting all the scratch. I don't know what scratch is. I don't think the jurors know what scratch is. And so I can easily see where based on experience, that's a code word in this particular group of drug dealers. So that becomes humble. I think you're just overstating the argument, and I want to challenge you on that. Well, I would absolutely go along with you that scratch could be viewed as drug lingo, even though it's more common than that. But I'm certainly not going to debate individual terms with you. Scratch could be seen as drug lingo. But Agent Gierske did not testify, oh, well, ladies and gentlemen of the jury, scratch means money. No, Agent Gierske took one statement of Mr. Overton and expanded it and provided a narrative of what that meant. And we know this, not least because at one point, the prosecutor asked Agent Gierske about a conversation. Well, just tell us generally what this conversation is about. The prosecutor did not ask about specific terms or drug lingo. The prosecutor offered to let Agent Gierske provide a running narrative of these statements. And defense counsel did an excellent job in repeatedly and in detail objecting to this testimony, presaging in pretrial motions exactly the problem that arose in trial. Did any of the testimony that the agent presented in the manner that you've described, did it come from any other witnesses too, properly? Or was it pretty much standalone testimony about those messages? It was pretty much standalone. If we take that expert testimony out, what do we have left? No controlled buys involving Mr. Overton. Mr. Overton was never seen at 1001 17th Avenue, which was the center of this trade. No confidential informant ever said they got heroin from Mr. Overton. There was evidence that Mr. Overton took heroin from the conspiracy and loses it or used it. And as for Mr. Overton's customers, most, if not all, were discovered for the first time by law enforcement two weeks or less prior to trial. So no, the expert testimony regarding my client's statements was pretty much standalone. And I would argue that it really the blueprint for the jury to find my client guilty of conspiracy. Without that blueprint, you're left with a very dubious case. And I have reserved four minutes for rebuttal. I'd like to take that now unless your honors have additional questions. You may. Thank you. Ms. Schneider. Thank you, your honor. May it please the court. My name is Tori Schneider, and I represent the United States from the Southern District of Iowa. I'm going to start my time here by correcting some errors that I believe are in the record and that were stated by appellant. First of all, regarding this first issue in the expert witness issue, Agent Gerskis' expertise and his qualifications was never raised, was never challenged in a motion in limine or at trial. There was the only objections or issues that appellant had with this issue was the methodology, and that was just discussed. But any issues with Agent Gerskis' expertise is raised for the first time on appeal. Regarding the sufficiency of the evidence issue, I would like to point out to the court that in appellant's motion for a new trial, they have conceded every element except whether the 100 grams of heroin was reasonably foreseeable to appellant. But yet in appellant's brief, he goes back and is challenging all of these elements again. However, he had previously conceded those. The issues raised regarding the closing argument, again, only one of those issues is arguably preserved for appeal. And then appellant states in his brief that there is no evidence that appellant had ever lived at or been to the 1001 17th Avenue residence. And that is also untrue. There's a stipulation in the record at Exhibit 57 in which the stipulation states that appellant gave that address when he got out of prison. He gave that address at another point when he was arrested in Chicago. So there was a stipulation linking appellant to that address. So I just wanted to correct those inaccuracies. Regarding the expert witness issue, there was drug lingo involved, as Judge Strauss points out. In addition to Scratch, there was Little Babies, White Boys, Plug, 65AG. There was plenty of drug lingo that Agent Gerskis testified about. And the district court was very good in, I don't know if reigning in is the right word, but there was a question of, please just interpret this call or what does this call mean? That was some of the first questions that were asked of Agent Gerskis. And upon objection by defense counsel, the district court was very clear that the prosecutor needed to ask the questions in your training and experience and ask only to define certain words or phrases. So the district court was very good at running this portion of the trial in conformity with Morales from this court. Well, I think that's right. It sounds like the district court was trying to about this sort of conflation of the experts and lay testimony. But as I see the record as it then develops, the questions still remain, can you tell us what does this conversation mean? What is this all about? Help us understand this. Would you disagree that those questions continued in that fashion? Yes, Your Honor. I would disagree with that. It was only very briefly at the beginning. I believe it's pages 290 to 293 in the transcript, if I'm not mistaken, was prior to the bench conference. And from that point on, the prosecutor asked only for words and phrases, not please tell us what this call means. The prosecutor asked Agent Gerskis specifically after playing the call would pick out words and ask for the definition or what that meant rather than the call as a whole. And as counsel has stated, no circuit has categorically prohibited an agent from testifying as both a lay and an expert witness. And the district court relied heavily on the Seventh Witness as to drug lingo that they knew just from the drug trade, but also as a lay witness from the terms that they had learned that were unique to that organization. And in this case, Agent Gerskis was the only person who was qualified to testify about these wiretap calls because of his intimate knowledge, not only of this investigation, but of the players in this conspiracy whom he had known for many, many years from his time in law enforcement. Because there were nicknames used, because there were places used that were not referred to in common English, he was the best qualified person to testify. Judge Weiser stated in Moreland that it is unnecessary to give the distinction if one is testifying as a lay witness versus an expert witness, that those tags are inessential and ill-advised. Counsel, I want to return to the bench conference point because I was just, I was looking at some notes and you're absolutely right in terms of your reading of the record, which is that based on your training and experience does show up post-bench conference. But the problem I still have, and I just want to give you a chance to respond to it, looking at some of those instances, is this is not a situation in which the prosecutor said, based on your training and experience, what does scratch mean? Okay, what the prosecutor says is, based on your training experience, what does the following two sentences mean? And that's a little different. And I'm wondering whether that poses a problem because that, you just kind of made the case for me on this point, which is this guy's been, this particular witness has been in this conspiracy world for a long time interacting with a lot of folks. So how do we know that this is his expert testimony, right, based on the word or rather what he's learned as part of, you know, from this conspiracy itself? Thank you, your honor. First, I'm not sure, and perhaps what you've said is correct, that they were two sentences, but I thought from my recollection that they were much shorter than that post-bench conference, but perhaps it was as long as two sentences. However, I don't believe that it is improper that the lay and expert testimony with regard to the wiretap questions was improper. You're correct that it is a bit enmeshed, and I do not believe that there was a question solely about the wiretap. They questioned him solely about the wiretap before any other part of the investigation. But regarding what he learned as an agent in the investigation and what he learned just as an expert through his general experience is a bit enmeshed. And I believe that that is cured by the standard instruction, jury instruction that is given to the jurors about the weight that they can give to expert testimony, and it is up to them how much weight to give it and whether to believe it or not. Because even if Agent Herskus had only testified to the items that he knew as a lay witness, as an agent investigating this conspiracy, he would have been allowed to testify about his extensive background and his qualifications. So, that bolstered any of his lay witness testimony. That brings up a question. Morales talked about bifurcating the questions as one particular point so that we're clear on which comes from which part of this knowledge. Why not bifurcate it here? I know we're Monday morning quarterbacking, but that would have helped a little bit in helping us figure out what's going on in this case. I appreciate that concern, Judge Strauss. I believe that this agent's testimony was bifurcated in the sense of the wiretap versus the rest of the investigation. I'm not certain that you could bifurcate his testimony regarding the wiretap and the meaning of those calls. And again, as Judge Posner stated in Moreland, that is unnecessary and it could actually be confusing to the jury to do it that way. I do know that the district court relied heavily on Moreland and Morales in its decision to allow this testimony. And that is, I believe, evidenced by the way she conducted the trial on this point. Regarding the sufficiency of the evidence, as I stated... Actually, I would like one more point on the expert witness. I would like to point out that the defense never challenged any of Agent Gerskis' conclusions or any of his interpretations. And in fact, the defense used Agent Gerskis as an expert to define certain words and phrases upon cross-examination. And Judge Pelley, your question, was the agent's testimony, his expert testimony ever corroborated? Yes, it was. Kimonte Smith, one of the cooperators in this case, did testify to a lot of these regarding the plug, the 65AG, and those types of things. But Kimonte Smith's testimony significantly corroborated Agent Gerskis' testimony on virtually all of this. So it was corroborated, your honor. Regarding the sufficiency of the evidence, as I stated earlier, initially, appellant did concede those elements in their motion for a new trial. 100 grams of heroin is reasonably foreseeable to this appellant. This conspiracy was not involved in heroin prior to the appellant's release from prison. It was at that time that there's evidence and multiple witnesses testified that this appellant is the one with the heroin connect and the customers. And immediately upon him being released from prison, Kimonte Smith testified that he first received 100 grams of heroin. He justified that appellant was present at the 1001 17th Avenue residence when it was caught up. Additionally, there's the text message from the wiretap that appellant was meeting with the source of the heroin in Chicago, and that the $65 a gram is a wholesale amount, a wholesale price for heroin. And then additionally, appellant, there was about 500 grams of heroin that was dug out of the backyard of 1001 17th Avenue. So 100 grams of heroin is certainly reasonably foreseeable to an appellant. Counsel, I want to ask you about the, so once we got to the end of the expert testimony, this also deals with sufficiency evidence. I think the pressure point here for me, just to be honest, is whether the error on the expert witness might have been harmless anyways. And my understanding, although I want to give both parties a chance to respond to this, is that a lot of the evidence that the officer gave was repeated by one of the fact witnesses. I think it was, I think you may have mentioned him, I forget his name, but there was a lot of overlap there. And then you have all the other evidence. So I just want to give you a chance, Kimanti Smith, I want to give you a chance to respond to that because I want to hear from both sides. Yes, your honor. And yes, you're correct. It was Kimanti Smith who testified largely about the same information and corroborated Agent Gerskus' testimony. And so it is the government's position that if this is harmless, it obviously will be harmless beyond a reasonable doubt. Or if this was error, it would be harmless beyond a reasonable doubt due to that, as well as just the other, the overwhelming evidence that appellant was involved in this conspiracy that he was selling to these customers, which was conceded in closing argument by the defense. And so yes, any error on the expert witness would be harmless. Is there any concern that even if there's some overlap between the witness, the cooperating witness who testified and the agent's testimony that the agent's testimony was a bolster to an otherwise impeachable witness, the co-conspirator? I don't believe so, your honor. I believe by putting on Agent Gerskus and his background and his qualifications, that stands alone. And Kimanti Smith was cross examined, I think, very well on his impeachable issues here and his plea agreement and what he was going to get at sentencing. And so I don't believe that Agent Gerskus would have bolstered the cooperating witness's testimony in that regard. I would disagree with that, your honor. If there are no further questions, the government respectfully requests that you would affirm appellant's conviction. Thank you. Thank you, counsel. Mr. Morrison. Thank you, your honor. And Judge Strauss just mentioning your harmless error question. How can we find that there is harmless error beyond a reasonable doubt when you've got Kimanti Smith, who was a conspirator, who is now testifying himself to get out of hot water and is advertising his sudden change of conscience and newfound morality, how can we find that a longstanding local law enforcement officer who is involved in this investigation and has been held out as an expert, how can we find that eliminating the testimony of that law enforcement agent is harmless error beyond a reasonable doubt? Well, I think it wouldn't be just that. There are problems with, as you know, but it's also the fact that I know you raised sufficient evidence, but the other part of the argument, as you heard government counsel say, is that the evidence was pretty strong on his participation in the conspiracy. Well, I simply disagree with that. We're not talking about a distribution charge. We're talking about a conspiracy charge for which there has to be a meeting of the minds. And had Agent Gierske's not been permitted to testify, certainly it's possible that the jury would have found my client guilty of conspiracy. But I don't think we can conclude beyond a reasonable doubt that the jury would have been guilty because the customers were found two weeks before trial and my client's co-conspirators were busy telling the jurors that Thomas can't be trusted. Thomas is a drug addict. Any heroin we give to Thomas, he'll use. That doesn't sound to me like a drug conspiracy distribution co-conspirator. That sounds to me like an addict who wants his fix. And if we're talking about a conspiracy, we're talking about a meeting of the minds, and Camonte Smith and Hortense Ralston and all the other folks, they seem to have different goals in mind than my client. My client wanted to get high. They wanted to build an empire. They wanted money. Without Agent Gierske's there, I think there's serious doubt about the sufficiency of the evidence in this case. And with that, your honors, unless you have additional questions, I will rest and ask that you vacate the conviction and remand for a new trial. Thank you, counsel. Thank you to both counsel for your arguments. We appreciate it and we will take the matter under consideration.